# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS—EASTERN DIVISION

THE AMERICAN BOTTLING
COMPANY, a Delaware corporation,
                Plaintiff,

v.

RED BULL NORTH AMERICA
INC., a California corporation,
                Defendant.

Case No. **00C 2645**

**JUDGE LINDBERG**
**MAGISTRATE JUDGE LEVIN**

FILED-ED5
00 MAY -2 PM 2: 29
CLERK
U.S. DISTRICT COURT

## COMPLAINT

The American Bottling Company ("ABC"), by and through its attorneys, for its complaint against Red Bull North America Inc. ("RBNA"), alleges as follows:

### Description Of The Litigation

1.    This case involves RBNA's improper attempt to terminate ABC, the exclusive Illinois distributor for RBNA's increasingly popular "energy drink" known as Red Bull. ABC has been the exclusive distributor of Red Bull in Illinois since 1998 under the parties' September, 1998 Distributorship Agreement (the "Agreement").

2.    At the outset of the relationship, Red Bull was not well known in Illinois. At great cost, ABC actively has promoted Red Bull. Its efforts have been extremely successful, as typified by the fact that sales for the first quarter of 2000 increased approximately 540% over sales for the first quarter of 1999.

3.    Notwithstanding ABC's success, on April 25, 2000, RBNA abruptly notified ABC that it was terminating ABC and ABC's rights to distribute Red Bull.

4.    The Agreement permits RNBA to terminate ABC only for certain enumerated reasons, one of which is a change in ABC's ownership. RNBA's only stated basis for terminating ABC is a purported change in the ownership of ABC. However, no

DOCKETED
MAY 0 3 2000

change in ABC's ownership has occurred and, accordingly, RBNA has no right to terminate ABC.

5.      Under the Agreement, ABC and RBNA are required to arbitrate all disputes.  ABC has commenced arbitration proceedings.  However, because RBNA's actions will cause immediate and irreparable injury to ABC, ABC brings this action for injunctive relief to maintain the status quo as of April 24, 2000, pending the satisfactory completion of the contractually agreed upon arbitration proceeding.

## The Parties, Jurisdiction, And Venue

6.      ABC is a Delaware corporation with its principal place of business in Illinois

7.      RBNA is a California corporation with its principal place of business in California.

8.      This Court has jurisdiction over ABC's request for relief under 28 U.S.C. §1332(a)(2), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is wholly between citizens of different states.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including performance under the Agreement.

## Background Information

10.      ABC bottles and distributes soft drinks and other beverages such as Dr Pepper, Seven Up, A&W, Dad's, Crush, Country Time, Snapple, Poland Springs and Red Bull.

11.      At all relevant times, ABC has been and continues to be a wholly-owned subsidiary of American Bottling Holdings, Inc.

2

12.     RBNA is the owner and/or licensee of the beverage Red Bull.  It manufactures Red Bull for distribution and sale within the United States.

13.     Red Bull is an "energy drink" developed in Europe in the early 1980's.  It is promoted by RBNA as and, in fact, has achieved success and popularity as a stimulation drink which improves performance, concentration, and reaction time, increases endurance, and detoxifies the body.  Sales of Red Bull accounted for 70% of the volume share and 87% of the dollar share of the estimated $1.5 billion in sales of energy drinks in Europe in 1999.  Red Bull was introduced into the United States 1998 and its popularity here is also soaring.  ABC's sales of Red Bull in the Chicago-Rockford area in 1999 alone were $1.7 million, an amount which is remarkable for a new product not previously known in the market, and which portends widespread acceptance and exponential sales growth.

### The Distributorship Agreement

14.     On information and belief, prior to September, 1998, Red Bull was not distributed in Illinois.

15.     On or about September 29, 1998, ABC and RBNA entered into the Agreement.  A true and correct copy is attached as Exhibit A.

16.     Under the Agreement, RBNA named ABC as its exclusive wholesale distributor of Red Bull in the state of Illinois.

17.     In exchange, ABC agreed to purchase from RBNA shipments of Red Bull, and to then diligently sell and promote Red Bull in Illinois.

18.     In fulfillment of its obligations under the Agreement, ABC trained its sales force in accordance with RBNA's requirements, and successfully sold and promoted Red Bull.

19.    Under the Agreement, RBNA is entitled to terminate ABC's exclusive right to distribute Red Bull in Illinois only on the limited grounds enumerated in section II of the Agreement.

### RBNA's Purported Termination Of The Agreement

20.    From September, 1998, until April 25, 2000, the parties operated under the terms of the Agreement. During that period, Red Bull has been a successful product for ABC and RBNA. ABC's sales of Red Bull have consistently grown, and account for a significant portion of ABC's revenues and profits from the sale of beverages in Illinois.

21.    At all times, ABC has fulfilled all of its obligations under the Agreement. RBNA has often praised ABC's sale and promotion of Red Bull.

22.    Despite the success of ABC's distribution of Red Bull for RBNA, on April 25, 2000, RBNA's Vice President of Sales/Marketing delivered to ABC a letter purporting to exercise its right to terminate the Agreement because "of the changes in ownership of The American Bottling Company, now known as Dr Pepper/Seven Up Bottling Group, Inc. ("ABC")." A true and correct copy is attached as Exhibit B.

23.    In the April 25, 2000, letter, RBNA states that it will stop selling Red Bull to ABC effective immediately, and that it will allow ABC to sell only its remaining inventory of Red Bull.

24.    On April 26, 2000, RBNA again wrote to ABC, this time stating that it could sell its remaining inventory of Red Bull only through the end of that week. A true and correct copy is attached as Exhibit C.

25.    Contrary to what is stated in FBNA's letter, the ownership of ABC has remained unchanged from the effective date of the Agreement. ABC remains a wholly owned subsidiary of American Bottling Holdings, Inc.

4

26.     RBNA has breached the Agreement by purporting to terminate it, by prohibiting ABC from selling its inventory of Red Bull, and by refusing to supply additional Red Bull to ABC.

27.     Under the terms of the Agreement, the parties agreed to arbitrate any dispute arising in connection with the Agreement. Agreement § VII. ABC has filed a Demand For Arbitration with the American Arbitration Association. A true and correct copy is attached as Exhibit D.

28.     ABC is entitled to preserve the status quo as of April 24, 2000, by seeking injunctive relief from this Court pending resolution of the parties dispute in arbitration. In fact, the rules of the American Arbitration Association which are incorporated by reference in the Agreement, explicitly recognize that "request[s] for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate." Commercial Arbitration Rules of the American Arbitration Association R-36, a true and correct copy of which are attached as Exhibit E.

29.     ABC has a clearly ascertainable right to distribute Red Bull as identified in the Agreement.

30.     ABC is likely to succeed on the merits in arbitration because the ownership and management of ABC have not changed and, therefore, RBNA had no basis for terminating the Agreement.

31.     RBNA's breach has caused and will continue to cause ABC irreparable injury which cannot be adequately remedied by a money judgment or any other remedy at law, because Red Bull is a popular, growing, and unique product which ABC cannot obtain from any other source. Because Red Bull is an emerging product, the market for it is

5

growing exponentially. Accordingly, past sales results do not accurately predict the profits that ABC will earn from future performance under the Agreement, thus making money damages impossible to determine with accuracy. However, because ABC's sales of Red Bull in 1999 were $1.7 million and were growing in 2000, the damages caused by RBNA's breach of the Agreement will exceed $75,000.

32. Furthermore, ABC's goodwill will suffer because of its inability to fulfill Red Bull orders to ABC's customers, substantially all of whom purchase other products from ABC and look to ABC as a reliable supplier for an entire product line. ABC risks losing retail shelf space and other marketing opportunities at stores where it fails to supply Red Bull as promised.

33. An adequate remedy at law is also unavailable to ABC because immediate preservation of the status quo is crucial. RBNA has already refused to supply additional Red Bull to ABC and purports to refuse to allow ABC to supply Red Bull to ABC's retail customers from its existing inventory.

34. RBNA will suffer no prejudice if an injunction is granted. ABC will continue to successfully market and promote Red Bull in Illinois, and RBNA will continue to enjoy the fruits of ABC's efforts.

**WHEREFORE** ABC respectfully requests the entry of an order temporarily, preliminarily, and permanently enjoining RBNA pending completion of the arbitration proceedings from refusing to honor its obligations under the Agreement, and from selling Red Bull to any company or person in violation of ABC's exclusive right to distribute Red Bull in Illinois, or to do any of the other acts which ABC is entitled to do under the Agreement.

Respectfully submitted,

THE AMERICAN BOTTLING COMPANY

Dated: May 2, 2000

By: _____

One Of The American Bottling Company's Attorneys

Alan S. Rutkoff
David Marx
Charles P. Beveridge
Anthony F. Fata
McDermott, Will & Emery
227 W. Monroe Street, Suite 3100
Chicago, IL   60606
(312) 372-2000 voice
(312) 984-7700 fax
CHI99 3462941-1.036467.0010

# EXHIBIT A



**Red Bull North America, Inc.**
SUNSET COAST PLAZA, SUITE 270
17383 SUNSET BOULEVARD
PACIFIC PALISADES, CA 90272
PHONE: (310) 230-2350 FAX (310) 230-2361

# DISTRIBUTORSHIP AGREEMENT

Pursuant to the terms and conditions of this Agreement, <u>American Bottling Company</u> ("Distributor") is appointed the exclusive wholesale distributor of the Red Bull Energy Drink ("Product") of Red Bull North America, Inc. ("Red Bull") in the territory described on <u>Exhibit "1"</u> ("Territory"). This Agreement may only be terminated in accordance with the provisions of Section II herein.

Distributor is not entitled to distribute any other Red Bull products, present or future, unless such products are expressly authorized in writing signed by a Red Bull officer, in which event all such additional products are subject to the terms and conditions of this Agreement. The following terms and conditions are hereby agreed upon:

I. <u>TERMS OF SALE</u>

A. Each order submitted by Distributor to Red Bull is subject to Red Bull's acceptance or rejection at its offices in Pacific Palisades, California. Unless Red Bull notifies Distributor of other terms of sale, all purchases by Distributor are F.O.B. Distributor's warehouse at prices established by Red Bull and effective at the time of shipment. Red Bull shall have no liability in the event of any rejection of or delay in filling or shipping Distributor's orders.

B. Red Bull shall:

(1) Promptly process and acknowledge Distributor's orders that are accepted by Red Bull. In the event of any rejection or delay by Red Bull in filling or delivering such orders, Red Bull shall use its best efforts to notify Distributor of such rejection or delay as soon as practicable.

(2) Make reasonable efforts to meet Distributor's requested delivery schedule in accordance with Distributor's delivery requests, provided the requested delivery schedule is commercially reasonable. In the event the Product is in limited supply or its availability is otherwise restricted, Red Bull shall have the right in its sole discretion and judgment to allocate the Product to and among Distributor and other Red Bull distributors.

(3) Provide Distributor with reasonable quantities of such point-of-sale and other in-store product advertising materials as Red Bull has available for the Product, provided Distributor meets Red Bull's criteria for receiving and using those advertising materials.

(4) Advise Distributor in advance of any national or local advertising programs conducted by Red Bull for the Product, and of Red Bull's promotional programs for the Product.



### Red Bull North America, Inc.

C. Distributor shall:

(1) Provide all proper distribution services for, develop the full potential for, and diligently sell, distribute, promote and merchandise the Product in all retail accounts in the Territory.

(2) Buy the Product only from Red Bull, sell the Product only to retail accounts and not sell the Product outside the Territory, unless otherwise authorized in writing by a Red Bull officer.

(3) Not distribute or otherwise sell or solicit orders in the Territory for any other "energy drink", which is defined as any drink positioned to replenish energy, any drink making energy-related claims on its package or other advertising material and/or any drink containing taurine, glucuronolactone or more than 150 mg. of caffeine per liter, except for energy drinks other than the Product sold to Distributor by Red Bull or sold to Distributor by other suppliers represented by Distributor as of the date of this Agreement.

(4) Receive all Products purchased from Red Bull only at Distributor's warehouse(s) in the Territory and place those Products in such warehouse(s) upon receipt, unless alternate arrangements are approved in writing by a Red Bull officer.

(5) Maintain a fully staffed, trained to Red Bull standards and supervised sales team for the Product, with responsibility for sales to all retail accounts.

(6) Cause its Product sales personnel and/or management to call on all retail accounts with such frequency as may be reasonably required by Red Bull from time to time.

(7) Achieve and maintain Red Bull standards for shelf and cold box conditions, execute Red Bull promotional programs in accordance with Red Bull standards for point of-sale, floor display and other promotional materials, and otherwise carry out Red Bull's merchandising standards. Distributor acknowledges that Red Bull standards for promotion, distribution and merchandising have been carefully developed and successfully used by Red Bull and its distributors to maximize sales of the Product not only for the present but also for the future. Distributor also agrees that failure to adhere to one or more of these standards could result in the eventual deterioration of the market position of the Product even though Distributor's current sales might be substantial and/or increasing.

(8) Maintain in-stock conditions for the Product in all retail accounts and maintain warehouse inventories of the Product sufficient to avoid out-of-stock conditions.

(9) Maintain and operate a prompt, effective and properly equipped delivery service.

(10) Maintain sufficient inventories of point-of-sale, display and other advertising materials supplied by Red Bull to carry out Red Bull programs. Inventories of such materials must be maintained in good condition and kept in locked storage with properly controlled access.

2



## Red Bull North America, Inc.

Distributor must (i) require its personnel to account for all electrical point of sale and refrigeration equipment, and (ii) have all retail accounts execute appropriate bailment agreements (in such form as approved by Red Bull) with regard to such equipment.

(11)     Maintain the financial capability necessary to achieve efficient and effective distribution of Red Bull products.

(12)     Submit to Red Bull timely reports and information on depletions, inventories, display installations, point-of-sale, advertising and display materials and equipment, and such other market information as Red Bull may request.

(13)   Allow Red Bull representatives reasonable inspection and review of Distributor's facilities and operations for the Product.

(14)   Maintain and operate adequate warehouse facilities including appropriate first-in, first-out and monitoring procedures.

(15)   Maintain the quality and integrity of the Product by, but not limited to, handling, storage and rotation of the Product in transportation, warehouse inventory and to the extent permitted by law, in all retail accounts in accordance with Red Bull's standards.

(16)   Take no action that may damage the reputation of the Product or may impair the reputation or competitive position of Red Bull or the Product in the trade.

(17)   Maintain and operate adequate data processing systems with appropriate procedures and controls.

(18)   Timely pay Red Bull for all Product purchased from Red Bull, in accordance with terms and methods of payment established from time to time by Red Bull. A late charge of the lesser of (i) 1.5% per month, or (ii) the maximum rate permitted by applicable law, will be assessed on all past due amounts.

(19)   Conduct its business in accordance with all applicable laws, rules and regulations.

(20)   Not have any authority to and not purport to assume or create any obligations by or on behalf of Red Bull.

(21)   Destroy promptly at Distributor's own expense any Product that becomes distressed merchandise as a result of Distributor's actions, omissions or neglect. "Distressed merchandise" means any Product that, in Red Bull's opinion, is damaged by age, freezing, excessive heat, mishandling, fire, flood or wreck or is in any other respect unsuitable for resale.



## Red Bull North America, Inc.

(22) Maintain adequate insurance on its inventory of the Product. This insurance must include a provision that, in the event of any insured loss, the insurer has no right and is not permitted to salvage any distressed merchandise. Upon Red Bull's request, Distributor must furnish evidence of such insurance.

(23) Not disclose, without the written consent of Red Bull, any statistical or other information about Distributor's purchases or sales of the Product except to Red Bull or, after giving Red Bull notice, as required by and in accordance with law.

(24) Not delegate in whole or in part any of its functions as a distributor, without prior written approval of a Red Bull officer.

(25) Notify Red Bull in writing immediately and in full of: any bankruptcy or insolvency proceedings involving Distributor or any owner of Distributor as a debtor; any assignment, as security or otherwise, for the benefit of any creditor of Distributor; any threatened or actual suspension, revocation or other impairment of any license or permit required by Distributor to distribute the Product; any proposed or actual delegation of its functions as a Distributor; any proposed, attempted or actual assignment or transfer of its rights and/or delegation of its obligations under this Agreement, whether by merger, operation of law or in any other manner; any proposed or actual change whatsoever in its ownership, control or management, including its Product sales manager; and/or any distribution by Distributor of any "energy drink", except for products sold to Distributor by Red Bull or any energy drink sold to Distributor by other suppliers represented by Distributor as of the date of this Agreement.

(26) Prepare and deliver to Red Bull on or before October 31st of each calendar year during the term of this Agreement an annual business plan for the next calendar year in a form and with content reasonably acceptable to Red Bull itemizing Distributor's proposed distribution services for, development of the full potential for, and diligent sales, distribution, promotion and merchandising activities for the Product in all retail accounts in the Territory and conduct Distributor's business concerning the Product during such next calendar year in substantial conformance with such business plan.

D.   Distributor acknowledges and agrees:

(1) that Distributor has not paid anything to or for the account of Red Bull for its appointment as a Red Bull distributor, and has no obligation to pay anything to or for the account of Red Bull for such appointment;

(2) that anything Distributor may have paid or given to acquire all or any part of any business or entity which formerly distributed the Product was not paid or given to or for the account of Red Bull or based on any representation or assurance of Red Bull or at the direction, suggestion or encouragement of Red Bull and was paid or given with full knowledge that any distributorship agreement with Red Bull is and was terminable by Red Bull in accordance with its terms and without any liability of Red Bull to pay compensation to Distributor or anyone else; and

4



**Red Bull North America, Inc.**

(3)     that all commitments and expenditures of Distributor in connection with the distribution, sale and promotion of the Product (including all dedicated sales personnel expenses) are and will be made by Distributor with the express understanding and knowledge that they are part of Distributor's on-going costs of doing business and that they do not give Distributor any right to distribute any products in any territory, or any right to continue to distribute the Product or any other right(s) whatsoever.

E.     Proper distribution of the Product requires highly personalized promotion and sales service efforts by the ownership and management of Distributor. The parties agree that this Agreement is entered into by Red Bull in reliance upon and in consideration of the personal qualifications of the present ownership and management of Distributor. It is further agreed that Red Bull enters into this Agreement on the understanding that, except as otherwise permitted herein, the present ownership will maintain ownership and control of Distributor and will be actively involved in the supervision of the business of Distributor, and that the present management will continue to manage the operations of Distributor.

F.     Distributor shall not sell, assign or transfer its rights or delegate its duties or obligations under this Agreement, by merger, operation of law or in any other manner, without the prior written consent of Red Bull which may be withheld in its sole discretion and Distributor acknowledges that any attempted sale, assignment, transfer or delegation shall be null and void and shall constitute a material breach of this Agreement.

G.     Red Bull has attached, as Exhibit "2" to this Agreement, a form of FDA continuing guarantee designed to relieve Distributor from responsibility if the Product is determined to be adulterated or misbranded under the Food, Drug and Cosmetic Act. **EXCEPT AS OTHERWISE SET FORTH IN EXHIBIT 2, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**

H.     Distributor shall, in accordance with instructions provided by Red Bull and/or policy statements concerning Product recall and withdrawal that Red Bull may issue from time to time, promptly implement any recall or withdrawal of the Product that may be requested by Red Bull. Distributor's costs incurred in connection with any such recall or withdrawal, including the cost of the Product and the reasonable cost of labor directly associated with the recall or withdrawal, shall be reimbursed to Distributor by Red Bull unless and except to the extent that the recall or withdrawal is the result of Distributor's acts or omissions. In the event of a recall or withdrawal not resulting from Distributor's acts or omissions, such reimbursement shall be Distributor's sole and exclusive remedy, whether in contract, tort or otherwise, for any breach of Red Bull's obligations under this Agreement.

I.     If the FDA materially changes the way in which it categorizes the Product or the nature of the claims that can be made about the Product, or if there are other changes to applicable laws or their interpretation that could adversely affect Red Bull's ability to import, advertise, distribute or sell the Product, Red Bull may terminate this Agreement without any liability to Distributor and shall not be



**Red Bull North America, Inc.**

responsible for any loss, cost, damage or expense suffered or incurred by Distributor as a result thereof (except as provided by Section I.K.)

       J.      Distributor acknowledges that (i) Red Bull is the registered owner and/or authorized licensee of all of the names, brand names, trademarks, trade names, marks, designs, trade dress and packaging associated with the Product (collectively, the "Marks"), and (ii) nothing contained herein shall give Distributor any right, title or interest in and to the Marks. Distributor agrees to (a) obtain prior approval and direction from Red Bull for any use of the Marks in any advertising or promotional materials not expressly authorized or furnished by Red Bull, (b) not do anything harmful to or inconsistent with Red Bull's rights or goodwill in the Marks; and (c) assist Red Bull in protecting those rights and goodwill, including assigning to Red Bull any rights acquired by Distributor (if any) in any of the Marks. Distributor also agrees not to do business under any name or designation associated with or similar to any Mark or otherwise used by Red Bull without prior written permission from a Red Bull officer. Such written permission is required for, among other things, any use of a Mark or such a trade name, trademark or trade dress on Distributor's stationery or equipment or in any advertising of Distributor. Distributor agrees to never contest Red Bull's exclusive ownership and right to use or license the use of any Mark or any other trademark, trade name or trade dress otherwise used by Red Bull.

       K.    Red Bull shall indemnify, defend, and hold Distributor harmless against and from (a) any and all claims made against Distributor based upon or arising out of the formulation of Product; claims made by Red Bull in any advertising, promotion or labeling; the preparation, manufacture or canning of the Product; the conduct of Red Bull's business; or any negligent act, intentional misconduct, misfeasance or nonfeasance by Red Bull or any of its affiliation, agents, contractors, servants or employees, and (b) any and all fees, including attorney's fees, costs and expenses, reasonably incurred by or on behalf of Licensor in the investigation of or defense against any and all such claims.

       L.   Red Bull shall secure and pay products liability and general liability insurance policies protecting both Red Bull and Distributor in connection with this Agreement. Such policies shall name Distributor as an additional insured.

## II.    TERMINATION

       A.    The following are grounds for immediate termination of this Agreement by Red Bull by written notice to Distributor:

          (1)     any change in the ownership or control of Distributor other than as the result of an initial public offering of Distributor's common stock;

          (2)     any breach by Distributor of any of the provisions of this Agreement including, without limitation, Sections I.C (1) through I.C (26) above, which breach is not cured by Distributor within sixty (60) days after written notice of such breach by Red Bull to Distributor;

          (3)     any material misrepresentation or any fraudulent conduct engaged in by Distributor in its dealings with Red Bull;



**Red Bull North America, Inc.**

      (4)     any insolvency, assignment for the benefit of creditors or bankruptcy proceeding commenced by, for or against Distributor;

      (5)     any suspension in excess of five (5) days or any revocation of a government license or permit necessary for Distributor to distribute the Product or for Red Bull to sell the Product to Distributor;

      (6)     any attempt by Distributor to assign or otherwise transfer its rights or delegate its duties or obligations under this Agreement in violation of Section I.F; and/or

      (7)     any material attachment, judicial or arbitration award or judicial lien is entered against Distributor or any of its assets.

      B.     Upon any termination of this Agreement, Red Bull may immediately appoint other distributors in the Territory and/or make sales itself in the Territory without liability to Distributor and Distributor must cease holding itself out to the public as a distributor of the Product, return to Red Bull at Red Bull's expense all Red Bull advertising, point-of-sale and other promotional materials and equipment, transfer to Red Bull or Red Bull's designee all information regarding Distributor's sales of the Product, and pay immediately for any purchases from Red Bull made prior to such termination. Upon any termination of this Agreement, Distributor's rights under this Agreement shall accordingly terminate, but all duties and obligations of Distributor shall continue until fully satisfied or relieved. At Red Bull's option exercised by written notice to Distributor, Red Bull may purchase or cause another entity to purchase, and Distributor shall sell to Red Bull or Red Bull's designee, all Product in Distributor's inventory that are in salable condition, as determined by Red Bull, at the laid-in cost of those Products to Distributor. Distributor acknowledges and agrees that Red Bull shall not have any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any termination of this Agreement (except as provided by Section I.K.)

      C.     In the event that Red Bull is otherwise entitled to terminate this Agreement, Red Bull may, alternatively, at its option exercised by written notice to Distributor, remove any part of Distributor's Territory and appoint other distributors for the Product therein or make sales of the Product directly therein, all without any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any such removal, appointment or sales. Any such removal of Territory will not by itself terminate this Agreement.

III.    <u>DISCHARGE AND RELEASE</u>

      Distributor and Red Bull hereby release and discharge each other from any and all monetary claims, damages, losses, obligations and liabilities (except for Distributor's obligations with respect to purchases of merchandise), known and unknown, that are not described in a written notice specifying the nature and amount of such claims, damages, losses, obligations or liabilities, and received by the adverse party within one year after such claims, damages, losses, obligations or liabilities first became known or should have been known. Distributor and Red Bull further hereby release and discharge each other from any and all monetary claims, damages, losses, obligations and liabilities (except for



## Red Bull North America, Inc.

Distributor's obligations with respect to purchases of merchandise), known and unknown, that may exist between them as of the date of this Agreement. In giving these releases and discharges to each other, Distributor and Red Bull each specifically waives its rights under Section 1542 of the California Civil code (and under any other similar provision of any applicable law), which Sections reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

## IV. WAIVER OF INCIDENTAL, SPECIAL, CONSEQUENTIAL AND PUNITIVE DAMAGES

**RED BULL AND DISTRIBUTOR SHALL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES SUFFERED, INCURRED OR CLAIMED BY DISTRIBUTOR OR RED BULL FOR ANY REASON, WHETHER BASED IN CONTRACT, TORT OR OTHERWISE AND WHETHER OR NOT CAUSED BY EITHER PARTY'S BREACH OF THIS AGREEMENT, NEGLIGENCE OR OTHER ACTIONS.**

## V. ENTIRE AGREEMENT AND NON-WAIVER

This Agreement sets forth the entire agreement of the parties regarding the subject matter of this Agreement, and supersedes all prior representations, agreements and understandings of any kind in regard to such subject matter. No agreements, commitments or understandings varying any term, provision, covenant or condition of this Agreement are binding upon either party unless made in writing, and signed by officers of both Distributor and Red Bull. Without limiting the generality of the foregoing, Distributor acknowledges and agrees that Red Bull is not obligated to appoint Distributor as a Red Bull distributor for any products or in any territory other than as expressly stated in this Agreement. Distributor and Red Bull further agree that neither will make a claim at any time that this Agreement has been orally altered, modified or waived in any respect whatsoever. A failure to enforce any provision of this Agreement in any instance is not a waiver of such provision in the same instance or in any other instance.

## VI. GOVERNING LAW

THIS AGREEMENT IS ENTERED INTO UNDER THE LAWS OF THE STATE OF CALIFORNIA AND SHALL BE GOVERNED BY AND CONSTRUED THEREUNDER, EXCLUDING ANY CONFLICTS OF LAW RULES THEREOF.

## VII. MANDATORY ARBITRATION

Any claim, dispute or controversy arising between the parties in connection with, out of or in relation to this Agreement, or any breach or termination hereof, shall be settled by binding arbitration conducted by a single neutral arbitrator in a neutral site in accordance with the rules of the American Arbitration Association then in effect, and judgment upon any award rendered may be entered in any court



## Red Bull North America, Inc.

having jurisdiction over the parties or their assets. In any such arbitration, the arbitrator shall be required to apply and follow the terms and conditions of this Agreement and the applicable law and shall not have the power to relieve either party from the application of any provision contained herein.

VIII.   NOTICES

All notices required to be given by a party under this Agreement must be in writing, and must be hand delivered or mailed by certified or registered mail, postage prepaid, to the other party at its address set forth below, or such other address as such party may have designated in writing by notice to the other party from time to time. Notices are effective upon hand delivery or five (5) days after mailing, as the case may be.

IX.   GENERAL PROVISIONS

A.    The relationship created by this Agreement is that of independent contractors and the parties hereby acknowledge and agree that nothing herein shall be deemed to constitute Distributor as an agent, partner, joint venturer or franchisee of Red Bull. Distributor hereby waives the benefit of any state or federal statutes relating to or dealing with the establishment and regulation of franchises.

B.    Any terms contained in Distributor's purchase orders or similar documents which conflict with or are inconsistent with the terms and conditions of this Agreement shall not apply to any sale of the Product. No additional terms of sale shall apply to any sale of the Product other than those referred to or contained in this Agreement unless such terms are expressly accepted in writing by an officer of Red Bull in its order acknowledgment.

C.    Distributor shall be responsible for the payment of all federal, state and local taxes that may be assessed against Distributor with regard to the distribution and sale of the Product or with regard to other Red Bull property in Distributor's possession. Distributor shall also be responsible for the payment of any federal, state or local sales or excise taxes on the sale and delivery of the Product to Distributor to the extent that such taxes are not included on Red Bull's invoices.

D.    Red Bull shall not be liable for its failure to perform hereunder due to contingencies beyond its reasonable control, including, but not limited to, strikes, riots, wars, fire, acts of God or acting in compliance with any law or government regulation.

E.    This Agreement may not be amended, modified or rescinded except by a written agreement signed by officers of both parties.

9



**Red Bull North America, Inc.**

X.   ACKNOWLEDGMENT OF REVIEW, REPRESENTATION OF AUTHORITY
     AND EFFECTIVE DATE

        The undersigned acknowledge that they have each reviewed the terms of this Agreement, that they fully understand those terms and that they have had the opportunity to consult with their respective counsel concerning those terms. The undersigned represent that they are duly authorized to sign this Agreement. This Agreement shall not become effective until executed on behalf of each party by an officer of such party and delivered to the other party.

Distributor:

*American Bottling Company*

By: *Michael Buckley*

Title: _VP, Marketing_

Date: _9/23/98_

Address: _7955 S. Cass Ave_
_Darien, Ill 60561_

Red Bull:

RED BULL NORTH AMERICA, INC.

By: _____
     Hans P. Vriens

Title: _Managing Director_

Date: _____

Address: 17383 Sunset Blvd., #270
        Pacific Palisades, CA 90272

10






**Red Bull North America, Inc.**

<u>EXHIBIT 1</u>

TERRITORY

The entire State of Illinois, U.S.A.



## Red Bull North America, Inc.

EXHIBIT 2

FDA CONTINUING GUARANTEE

Each shipment or other delivery of the Product hereafter made by Red Bull to, or in the order of Distributor is guaranteed, as of the date of such shipment or delivery to Distributor, to be, on such date, not adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, and not an article which may not, under the provisions of Sections 404, 505 or 512 of the Act, be introduced into interstate commerce. **EXCEPT AS OTHERWISE SET FORTH ABOVE, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**

# EXHIBIT B



**Red Bull North America, Inc.**
1453 3RD STREET PROMENADE, SUITE 420 • SANTA MONICA, CA 90401
PHONE: (310) 393-4647 FAX (310) 230-2363

April 25, 2000

**VIA HAND DELIVERY**

Mr. Joseph Shankland
Vice President, Sales/Marketing
Dr. Pepper/Seven Up Bottling Group, Inc.,
Midwest Division
7955 S. Cass Ave., Suite 201
Darien, IL 60561

Dear Mr. Shankland:

In view of the changes in ownership of The American Bottling Company, now known as Dr. Pepper/Seven Up Bottling Group, Inc. ("ABC"), and Red Bull's concern that these changes are likely to adversely affect the distribution of Red Bull in your territory, Red Bull hereby terminates ABC as its distributor, effective immediately upon your receipt of this notice, pursuant to Section II.A.(1) of the Distributorship Agreement dated September 24, 1998 between ABC and Red Bull.

Red Bull hereby notifies ABC that Red Bull is willing to purchase all Red Bull products in ABC's inventory that are in salable condition, as determined by Red Bull, at the laid-in cost of those products to ABC, or ABC may sell out such inventory at its discretion.

Very truly yours,

Terry Bigham
Vice President

# EXHIBIT C



**Red Bull**
ENERGY DRINK

Mr. Joseph R. Shankland                                       April 26, 2000
Vice President Sales/Marketing
Dr. Pepper/Seven Up Bottling Group, Inc.
Midwest Division
7955 S. Cass Ave., Suite 201
Darien, IL 60561

Dear Mr. Shankland,

Per my voicemail this morning, I wanted to confirm in writing Red Bull's decision regarding your proposed extension to the termination date. Red Bull will not extend the termination date. The termination of ABC is effective with the letter I presented to you on April 25, 2000. However, as we discussed, ABC may sell out your current inventory to service your customer base for the remainder of this week. Mr. Jay Koeller will call you on Monday, May 1, 2000 to discuss disposition of any remaining inventory.

If you have any questions please feel free to call me at (630) 904-5281.

Regards,

Terry Bigham
Vice President

# EXHIBIT D

# American Arbitration Association
## Commercial Arbitration Rules

To institute proceedings, please send two copies of this demand *and the arbitration agreement*, with the filing fe as provided in the rules, to the AAA. Send the original demand to the respondent.

### DEMAND FOR ARBITRATION

DATE: May 1, 2000

TO Name Red Bull North America, Inc., Attn: Terry Bigham

Address 1453 3rd Street Promenade, Suite 420

(of the Party on Whom the Demand is Made)

City and State Santa Monica, CA    ZIP Code 90401

Telephone (310) 393-4647    Fax 310-230-2361

Name of Representative John F. Verhey

Representative's Address 161 N. Clark Street, Suite 2650

Name of Firm (if Applicable) Seidler & McErlean

City and State Chicago, IL    ZIP Code 60601

Telephone (312) 516-0703    Fax 312-516-0709

The named claimant, a party to an arbitration agreement contained in a written contract, dated September 24, 1998 and providing for arbitration under the Commercial Arbitration Rules of the America Arbitration Association, hereby demands arbitration thereunder.

THE NATURE OF THE DISPUTE: Red Bull's wrongful purported termination of its Distributorship Agreement with The American Bottling Company, as described in further detail in Attachment A.

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any): Declaration that the Distributorship Agreement is effective, that Red Bull's purported termination is without basis and was wrongful, such other reflief, as may be proper.

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP? ☐ Yes ☒ No

TYPES OF BUSINESS: Claimant Beverage Distributor    Respondent Beverage Manufacturer

HEARING LOCALE REQUESTED: Chicago, IL
(City and State)

You are hereby notified that copies of our arbitration agreement and this demand are being filed with th American Arbitration Association at its Chicago office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from th AAA.

Signed [signature]    Title Attorney
(May Be Signed by a Representative)

Name of Claimant American Bottling Company

Address (to Be Used in Connection with This Case) 7955 S. Cass Avenue, Suite 201

City and State Darrien, IL    ZIP Code 60561

Telephone (630) 241-5285    Fax 630-769-8544

Name of Representative Alan S. Rutkoff, Charles P. Beveridge

Name of Firm (if Applicable) McDermott, Will & Emery

Representative's Address 227 W. Monroe, Suite 3100

City and State Chicago, IL    ZIP Code 60606

Telephone (312) 372-2000    Fax 312-984-7700

MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. I you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this matter, please check this bo (there is no additional administrative fee for this service).

Form G3-3/98



**Demand For Arbitration**
The American Bottling Company
and
Red Bull North America, Inc.

## Attachment A

The American Bottling Company ("ABC") and Red Bull North America, Inc. ("RBNA") entered into a Distributorship Agreement ("Agreement") on or about September 29, 1998. Pursuant to the agreement, RBNA agreed to sell its popular "energy drink" Red Bull to ABC, which agreed to promote and exclusively distribute Red Bull in Illinois.

The parties can terminate the Agreement only pursuant to the grounds for termination recited within the Agreement. On April 25, 2000, RBNA purported to exercise its right to terminate the Agreement because of a claimed change in the ownership of ABC. A change in ABC's ownership is a ground for termination under the Agreement.

In fact, the ownership of ABC has not changed. Therefore, RBNA's termination of the Agreement is ineffective and wrongful, and RBNA's refusal to fulfill its obligations under the Agreement constitutes a breach of the Agreement.

ABC will suffer substantial injury as a result of RBNA's breach of the Agreement because, among other reasons, ABC is unable to obtain Red Bull from any source; ABC will lose substantial revenues and profits; and ABC will suffer substantial injury to its goodwill and reputation. ABC seeks to enforce the contract and to recover all relief to which it is entitled. A copy of the Agreement is attached.

CHI99 3462703-1.036467.0010



**Red Bull North America, Inc.**
SUNSET COAST PLAZA, SUITE 270
17383 SUNSET BOULEVARD
PACIFIC PALISADES, CA 90272
PHONE: (310) 230-2350 FAX (310) 230-2361

## DISTRIBUTORSHIP AGREEMENT

Pursuant to the terms and conditions of this Agreement, American Bottling Company ("Distributor") is appointed the exclusive wholesale distributor of the Red Bull Energy Drink ("Product") of Red Bull North America, Inc. ("Red Bull") in the territory described on Exhibit "1" ("Territory"). This Agreement may only be terminated in accordance with the provisions of Section II herein.

Distributor is not entitled to distribute any other Red Bull products, present or future, unless such products are expressly authorized in writing signed by a Red Bull officer, in which event all such additional products are subject to the terms and conditions of this Agreement. The following terms and conditions are hereby agreed upon:

I.   **TERMS OF SALE**

A.   Each order submitted by Distributor to Red Bull is subject to Red Bull's acceptance or rejection at its offices in Pacific Palisades, California. Unless Red Bull notifies Distributor of other terms of sale, all purchases by Distributor are F.O.B. Distributor's warehouse at prices established by Red Bull and effective at the time of shipment. Red Bull shall have no liability in the event of any rejection of or delay in filling or shipping Distributor's orders.

B.   Red Bull shall:

(1)   Promptly process and acknowledge Distributor's orders that are accepted by Red Bull. In the event of any rejection or delay by Red Bull in filling or delivering such orders, Red Bull shall use its best efforts to notify Distributor of such rejection or delay as soon as practicable.

(2)   Make reasonable efforts to meet Distributor's requested delivery schedule in accordance with Distributor's delivery requests, provided the requested delivery schedule is commercially reasonable. In the event the Product is in limited supply or its availability is otherwise restricted, Red Bull shall have the right in its sole discretion and judgment to allocate the Product to and among Distributor and other Red Bull distributors.

(3)   Provide Distributor with reasonable quantities of such point-of-sale and other in-store product advertising materials as Red Bull has available for the Product, provided Distributor meets Red Bull's criteria for receiving and using those advertising materials.

(4)   Advise Distributor in advance of any national or local advertising programs conducted by Red Bull for the Product, and of Red Bull's promotional programs for the Product.



### Red Bull North America, Inc.

C.    Distributor shall:

(1)    Provide all proper distribution services for, develop the full potential for, and diligently sell, distribute, promote and merchandise the Product in all retail accounts in the Territory.

(2)    Buy the Product only from Red Bull, sell the Product only to retail accounts and not sell the Product outside the Territory, unless otherwise authorized in writing by a Red Bull officer.

(3)    Not distribute or otherwise sell or solicit orders in the Territory for any other "energy drink", which is defined as any drink positioned to replenish energy, any drink making energy-related claims on its package or other advertising material and/or any drink containing taurine, glucuronolactone or more than 150 mg. of caffeine per liter, except for energy drinks other than the Product sold to Distributor by Red Bull or sold to Distributor by other suppliers represented by Distributor as of the date of this Agreement.

(4)    Receive all Products purchased from Red Bull only at Distributor's warehouse(s) in the Territory and place those Products in such warehouse(s) upon receipt, unless alternate arrangements are approved in writing by a Red Bull officer.

(5)    Maintain a fully staffed, trained to Red Bull standards and supervised sales team for the Product, with responsibility for sales to all retail accounts.

(6)    Cause its Product sales personnel and/or management to call on all retail accounts with such frequency as may be reasonably required by Red Bull from time to time.

(7)    Achieve and maintain Red Bull standards for shelf and cold box conditions, execute Red Bull promotional programs in accordance with Red Bull standards for point of-sale, floor display and other promotional materials, and otherwise carry out Red Bull's merchandising standards.    Distributor acknowledges that Red Bull standards for promotion, distribution and merchandising have been carefully developed and successfully used by Red Bull and its distributors to maximize sales of the Product not only for the present but also for the future.  Distributor also agrees that failure to adhere to one or more of these standards could result in the eventual deterioration of the market position of the Product even though Distributor's current sales might be substantial and/or increasing.

(8)    Maintain in-stock conditions for the Product in all retail accounts and maintain warehouse inventories of the Product sufficient to avoid out-of-stock conditions.

(9)    Maintain and operate a prompt, effective and properly equipped delivery service.

(10)    Maintain sufficient inventories of point-of-sale, display and other advertising materials supplied by Red Bull to carry out Red Bull programs.  Inventories of such materials must be maintained in good condition and kept in locked storage with properly controlled access.

2



### Red Bull North America, Inc.

Distributor must (i) require its personnel to account for all electrical point of sale and refrigeration equipment, and (ii) have all retail accounts execute appropriate bailment agreements (in such form as approved by Red Bull) with regard to such equipment.

(11)     Maintain the financial capability necessary to achieve efficient and effective distribution of Red Bull products.

(12)     Submit to Red Bull timely reports and information on depletions, inventories, display installations, point-of-sale, advertising and display materials and equipment, and such other market information as Red Bull may request.

(13)     Allow Red Bull representatives reasonable inspection and review of Distributor's facilities and operations for the Product.

(14)     Maintain and operate adequate warehouse facilities including appropriate first-in, first-out and monitoring procedures.

(15)     Maintain the quality and integrity of the Product by, but not limited to, handling, storage and rotation of the Product in transportation, warehouse inventory and to the extent permitted by law, in all retail accounts in accordance with Red Bull's standards.

(16)     Take no action that may damage the reputation of the Product or may impair the reputation or competitive position of Red Bull or the Product in the trade.

(17)     Maintain and operate adequate data processing systems with appropriate procedures and controls.

(18)     Timely pay Red Bull for all Product purchased from Red Bull, in accordance with terms and methods of payment established from time to time by Red Bull. A late charge of the lesser of (i) 1.5% per month, or (ii) the maximum rate permitted by applicable law, will be assessed on all past due amounts.

(19)     Conduct its business in accordance with all applicable laws, rules and regulations.

(20)     Not have any authority to and not purport to assume or create any obligations by or on behalf of Red Bull.

(21)     Destroy promptly at Distributor's own expense any Product that becomes distressed merchandise as a result of Distributor's actions, omissions or neglect. "Distressed merchandise" means any Product that, in Red Bull's opinion, is damaged by age, freezing, excessive heat, mishandling, fire, flood or wreck or is in any other respect unsuitable for resale.



## Red Bull North America, Inc.

(22) Maintain adequate insurance on its inventory of the Product. This insurance must include a provision that, in the event of any insured loss, the insurer has no right and is not permitted to salvage any distressed merchandise. Upon Red Bull's request, Distributor must furnish evidence of such insurance.

(23) Not disclose, without the written consent of Red Bull, any statistical or other information about Distributor's purchases or sales of the Product except to Red Bull or, after giving Red Bull notice, as required by and in accordance with law.

(24) Not delegate in whole or in part any of its functions as a distributor, without prior written approval of a Red Bull officer.

(25) Notify Red Bull in writing immediately and in full of: any bankruptcy or insolvency proceedings involving Distributor or any owner of Distributor as a debtor; any assignment, as security or otherwise, for the benefit of any creditor of Distributor; any threatened or actual suspension, revocation or other impairment of any license or permit required by Distributor to distribute the Product; any proposed or actual delegation of its functions as a Distributor; any proposed, attempted or actual assignment or transfer of its rights and/or delegation of its obligations under this Agreement, whether by merger, operation of law or in any other manner; any proposed or actual change whatsoever in its ownership, control or management, including its Product sales manager; and/or any distribution by Distributor of any "energy drink", except for products sold to Distributor by Red Bull or any energy drink sold to Distributor by other suppliers represented by Distributor as of the date of this Agreement.

(26) Prepare and deliver to Red Bull on or before October 31st of each calendar year during the term of this Agreement an annual business plan for the next calendar year in a form and with content reasonably acceptable to Red Bull itemizing Distributor's proposed distribution services for, development of the full potential for, and diligent sales, distribution, promotion and merchandising activities for the Product in all retail accounts in the Territory and conduct Distributor's business concerning the Product during such next calendar year in substantial conformance with such business plan.

D. Distributor acknowledges and agrees:

(1) that Distributor has not paid anything to or for the account of Red Bull for its appointment as a Red Bull distributor, and has no obligation to pay anything to or for the account of Red Bull for such appointment;

(2) that anything Distributor may have paid or given to acquire all or any part of any business or entity which formerly distributed the Product was not paid or given to or for the account of Red Bull or based on any representation or assurance of Red Bull or at the direction, suggestion or encouragement of Red Bull and was paid or given with full knowledge that any distributorship agreement with Red Bull is and was terminable by Red Bull in accordance with its terms and without any liability of Red Bull to pay compensation to Distributor or anyone else; and

4



**Red Bull North America, Inc.**

(3)  that all commitments and expenditures of Distributor in connection with the distribution, sale and promotion of the Product (including all dedicated sales personnel expenses) are and will be made by Distributor with the express understanding and knowledge that they are part of Distributor's on-going costs of doing business and that they do not give Distributor any right to distribute any products in any territory, or any right to continue to distribute the Product or any other right(s) whatsoever.

E.  Proper distribution of the Product requires highly personalized promotion and sales service efforts by the ownership and management of Distributor. The parties agree that this Agreement is entered into by Red Bull in reliance upon and in consideration of the personal qualifications of the present ownership and management of Distributor. It is further agreed that Red Bull enters into this Agreement on the understanding that, except as otherwise permitted herein, the present ownership will maintain ownership and control of Distributor and will be actively involved in the supervision of the business of Distributor, and that the present management will continue to manage the operations of Distributor.

F.  Distributor shall not sell, assign or transfer its rights or delegate its duties or obligations under this Agreement, by merger, operation of law or in any other manner, without the prior written consent of Red Bull which may be withheld in its sole discretion and Distributor acknowledges that any attempted sale, assignment, transfer or delegation shall be null and void and shall constitute a material breach of this Agreement.

G.  Red Bull has attached, as <u>Exhibit "2"</u> to this Agreement, a form of FDA continuing guarantee designed to relieve Distributor from responsibility if the Product is determined to be adulterated or misbranded under the Food, Drug and Cosmetic Act. **EXCEPT AS OTHERWISE SET FORTH IN EXHIBIT 2, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**

H.  Distributor shall, in accordance with instructions provided by Red Bull and/or policy statements concerning Product recall and withdrawal that Red Bull may issue from time to time, promptly implement any recall or withdrawal of the Product that may be requested by Red Bull. Distributor's costs incurred in connection with any such recall or withdrawal, including the cost of the Product and the reasonable cost of labor directly associated with the recall or withdrawal, shall be reimbursed to Distributor by Red Bull unless and except to the extent that the recall or withdrawal is the result of Distributor's acts or omissions. In the event of a recall or withdrawal not resulting from Distributor's acts or omissions, such reimbursement shall be Distributor's sole and exclusive remedy, whether in contract, tort or otherwise, for any breach of Red Bull's obligations under this Agreement.

I.  If the FDA materially changes the way in which it categorizes the Product or the nature of the claims that can be made about the Product, or if there are other changes to applicable laws or their interpretation that could adversely affect Red Bull's ability to import, advertise, distribute or sell the Product, Red Bull may terminate this Agreement without any liability to Distributor and shall not be



**Red Bull North America, Inc.**

responsible for any loss, cost, damage or expense suffered or incurred by Distributor as a result thereof (except as provided by Section I.K.)

    J.    Distributor acknowledges that (i) Red Bull is the registered owner and/or authorized licensee of all of the names, brand names, trademarks, trade names, marks, designs, trade dress and packaging associated with the Product (collectively, the "Marks"), and (ii) nothing contained herein shall give Distributor any right, title or interest in and to the Marks. Distributor agrees to (a) obtain prior approval and direction from Red Bull for any use of the Marks in any advertising or promotional materials not expressly authorized or furnished by Red Bull, (b) not do anything harmful to or inconsistent with Red Bull's rights or goodwill in the Marks; and (c) assist Red Bull in protecting those rights and goodwill, including assigning to Red Bull any rights acquired by Distributor (if any) in any of the Marks. Distributor also agrees not to do business under any name or designation associated with or similar to any Mark or otherwise used by Red Bull without prior written permission from a Red Bull officer. Such written permission is required for, among other things, any use of a Mark or such a trade name, trademark or trade dress on Distributor's stationery or equipment or in any advertising of Distributor. Distributor agrees to never contest Red Bull's exclusive ownership and right to use or license the use of any Mark or any other trademark, trade name or trade dress otherwise used by Red Bull.

    K.    Red Bull shall indemnify, defend, and hold Distributor harmless against and from (a) any and all claims made against Distributor based upon or arising out of the formulation of Product; claims made by Red Bull in any advertising, promotion or labeling; the preparation, manufacture or canning of the Product; the conduct of Red Bull's business; or any negligent act, intentional misconduct, misfeasance or nonfeasance by Red Bull or any of its affiliation, agents, contractors, servants or employees, and (b) any and all fees, including attorney's fees, costs and expenses, reasonably incurred by or on behalf of Licensor in the investigation of or defense against any and all such claims.

    L.    Red Bull shall secure and pay products liability and general liability insurance policies protecting both Red Bull and Distributor in connection with this Agreement. Such policies shall name Distributor as an additional insured.

## II.    TERMINATION

    A.    The following are grounds for immediate termination of this Agreement by Red Bull by written notice to Distributor:

    (1)    any change in the ownership or control of Distributor other than as the result of an initial public offering of Distributor's common stock;

    (2)    any breach by Distributor of any of the provisions of this Agreement including, without limitation, Sections I.C (1) through I.C (26) above, which breach is not cured by Distributor within sixty (60) days after written notice of such breach by Red Bull to Distributor;

    (3)    any material misrepresentation or any fraudulent conduct engaged in by Distributor in its dealings with Red Bull;

6



**Red Bull North America, Inc.**

(4)    any insolvency, assignment for the benefit of creditors or bankruptcy proceeding commenced by, for or against Distributor;

(5)    any suspension in excess of five (5) days or any revocation of a government license or permit necessary for Distributor to distribute the Product or for Red Bull to sell the Product to Distributor;

(6)    any attempt by Distributor to assign or otherwise transfer its rights or delegate its duties or obligations under this Agreement in violation of Section I.F; and/or

(7)    any material attachment, judicial or arbitration award or judicial lien is entered against Distributor or any of its assets.

B.    Upon any termination of this Agreement, Red Bull may immediately appoint other distributors in the Territory and/or make sales itself in the Territory without liability to Distributor and Distributor must cease holding itself out to the public as a distributor of the Product, return to Red Bull at Red Bull's expense all Red Bull advertising, point-of-sale and other promotional materials and equipment, transfer to Red Bull or Red Bull's designee all information regarding Distributor's sales of the Product, and pay immediately for any purchases from Red Bull made prior to such termination. Upon any termination of this Agreement, Distributor's rights under this Agreement shall accordingly terminate, but all duties and obligations of Distributor shall continue until fully satisfied or relieved. At Red Bull's option exercised by written notice to Distributor, Red Bull may purchase or cause another entity to purchase, and Distributor shall sell to Red Bull or Red Bull's designee, all Product in Distributor's inventory that are in salable condition, as determined by Red Bull, at the laid-in cost of those Products to Distributor. Distributor acknowledges and agrees that Red Bull shall not have any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any termination of this Agreement (except as provided by Section I.K.)

C.    In the event that Red Bull is otherwise entitled to terminate this Agreement, Red Bull may, alternatively, at its option exercised by written notice to Distributor, remove any part of Distributor's Territory and appoint other distributors for the Product therein or make sales of the Product directly therein, all without any liability or obligations to Distributor for any losses, damages, costs or expenses suffered or incurred by Distributor by reason of or resulting from any such removal, appointment or sales. Any such removal of Territory will not by itself terminate this Agreement.

III.    **DISCHARGE AND RELEASE**

Distributor and Red Bull hereby release and discharge each other from any and all monetary claims, damages, losses, obligations and liabilities (except for Distributor's obligations with respect to purchases of merchandise), known and unknown, that are not described in a written notice specifying the nature and amount of such claims, damages, losses, obligations or liabilities, and received by the adverse party within one year after such claims, damages, losses, obligations or liabilities first became known or should have been known. Distributor and Red Bull further hereby release and discharge each other from any and all monetary claims, damages, losses, obligations and liabilities (except for

7



**Red Bull North America, Inc.**

Distributor's obligations with respect to purchases of merchandise), known and unknown, that may exist between them as of the date of this Agreement. In giving these releases and discharges to each other, Distributor and Red Bull each specifically waives its rights under Section 1542 of the California Civil code (and under any other similar provision of any applicable law), which Sections reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

IV.    WAIVER OF INCIDENTAL, SPECIAL, CONSEQUENTIAL AND PUNITIVE DAMAGES

**RED BULL AND DISTRIBUTOR SHALL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES SUFFERED, INCURRED OR CLAIMED BY DISTRIBUTOR OR RED BULL FOR ANY REASON, WHETHER BASED IN CONTRACT, TORT OR OTHERWISE AND WHETHER OR NOT CAUSED BY EITHER PARTY'S BREACH OF THIS AGREEMENT, NEGLIGENCE OR OTHER ACTIONS.**

V.    ENTIRE AGREEMENT AND NON-WAIVER

This Agreement sets forth the entire agreement of the parties regarding the subject matter of this Agreement, and supersedes all prior representations, agreements and understandings of any kind in regard to such subject matter. No agreements, commitments or understandings varying any term, provision, covenant or condition of this Agreement are binding upon either party unless made in writing, and signed by officers of both Distributor and Red Bull. Without limiting the generality of the foregoing, Distributor acknowledges and agrees that Red Bull is not obligated to appoint Distributor as a Red Bull distributor for any products or in any territory other than as expressly stated in this Agreement. Distributor and Red Bull further agree that neither will make a claim at any time that this Agreement has been orally altered, modified or waived in any respect whatsoever. A failure to enforce any provision of this Agreement in any instance is not a waiver of such provision in the same instance or in any other instance.

VI.    GOVERNING LAW

THIS AGREEMENT IS ENTERED INTO UNDER THE LAWS OF THE STATE OF CALIFORNIA AND SHALL BE GOVERNED BY AND CONSTRUED THEREUNDER, EXCLUDING ANY CONFLICTS OF LAW RULES THEREOF.

VII.    MANDATORY ARBITRATION

Any claim, dispute or controversy arising between the parties in connection with, out of or in relation to this Agreement, or any breach or termination hereof, shall be settled by binding arbitration conducted by a single neutral arbitrator in a neutral site in accordance with the rules of the American Arbitration Association then in effect, and judgment upon any award rendered may be entered in any court





**Red Bull North America, Inc.**

having jurisdiction over the parties or their assets. In any such arbitration, the arbitrator shall be required to apply and follow the terms and conditions of this Agreement and the applicable law and shall not have the power to relieve either party from the application of any provision contained herein.

**VIII.   NOTICES**

All notices required to be given by a party under this Agreement must be in writing, and must be hand delivered or mailed by certified or registered mail, postage prepaid, to the other party at its address set forth below, or such other address as such party may have designated in writing by notice to the other party from time to time. Notices are effective upon hand delivery or five (5) days after mailing, as the case may be.

**IX.   GENERAL PROVISIONS**

A.   The relationship created by this Agreement is that of independent contractors and the parties hereby acknowledge and agree that nothing herein shall be deemed to constitute Distributor as an agent, partner, joint venturer or franchisee of Red Bull. Distributor hereby waives the benefit of any state or federal statutes relating to or dealing with the establishment and regulation of franchises.

B.   Any terms contained in Distributor's purchase orders or similar documents which conflict with or are inconsistent with the terms and conditions of this Agreement shall not apply to any sale of the Product. No additional terms of sale shall apply to any sale of the Product other than those referred to or contained in this Agreement unless such terms are expressly accepted in writing by an officer of Red Bull in its order acknowledgment.

C.   Distributor shall be responsible for the payment of all federal, state and local taxes that may be assessed against Distributor with regard to the distribution and sale of the Product or with regard to other Red Bull property in Distributor's possession. Distributor shall also be responsible for the payment of any federal, state or local sales or excise taxes on the sale and delivery of the Product to Distributor to the extent that such taxes are not included on Red Bull's invoices.

D.   Red Bull shall not be liable for its failure to perform hereunder due to contingencies beyond its reasonable control, including, but not limited to, strikes, riots, wars, fire, acts of God or acting in compliance with any law or government regulation.

E.   This Agreement may not be amended, modified or rescinded except by a written agreement signed by officers of both parties.

9



**Red Bull North America, Inc.**

X.   ACKNOWLEDGMENT OF REVIEW, REPRESENTATION OF AUTHORITY
AND EFFECTIVE DATE

The undersigned acknowledge that they have each reviewed the terms of this Agreement, that they fully understand those terms and that they have had the opportunity to consult with their respective counsel concerning those terms. The undersigned represent that they are duly authorized to sign this Agreement. This Agreement shall not become effective until executed on behalf of each party by an officer of such party and delivered to the other party.

Distributor:                                         Red Bull:

_American Bottling Company_           RED BULL NORTH AMERICA, INC.

By: _Michael Buckley_

Title: _VP Marketing_                       By: _____
Date: _9/23/98_                                           Hans P. Vriens
Address: _7955 S. Cass Ave_           Title: _Managing Director_
_Denver, Ill 60561_                           Date: _____
                                                          Address: _17383 Sunset Blvd.  #270_
                                                                         _Pacific Palisades, CA  90272_



**Red Bull North America, Inc.**

<u>EXHIBIT 1</u>

TERRITORY

The entire State of Illinois, U.S.A.

11



**Red Bull North America, Inc.**

EXHIBIT 2

FDA CONTINUING GUARANTEE

Each shipment or other delivery of the Product hereafter made by Red Bull to, or in the order of Distributor is guaranteed, as of the date of such shipment or delivery to Distributor, to be, on such date, not adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, and not an article which may not, under the provisions of Sections 404, 505 or 512 of the Act, be introduced into interstate commerce. **EXCEPT AS OTHERWISE SET FORTH ABOVE, RED BULL DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PRODUCT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.**

12

# EXHIBIT E

b. admissions made by another party in the course of the mediation proceedings;

c. proposals made or views expressed by the mediator; or

d. the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-13. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-14. Termination of Mediation

The mediation shall be terminated:

a. by the execution of a settlement agreement by the parties;

b. by a written declaration of the mediator to the effect that further efforts at mediation are no longer worthwhile; or

c. by a written declaration of a party or parties to the effect that the mediation proceedings are terminated.

## M-15. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation.

Neither the AAA nor any mediator shall be liable to any party for any act or omission in connection with any mediation conducted under these rules.

## M-16. Interpretation and Application of Rules

The mediator shall interpret and apply these rules insofar as they relate to the mediator's duties and responsibilities. All other rules shall be interpreted and applied by the AAA.

## M-17. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the mediation, including required traveling and other expenses of the mediator and representatives of the AAA, and the expenses of any witness and the cost of any proofs or expert advice produced at the direct request of the mediator, shall be borne equally by the parties unless they agree otherwise.

## Administrative Fees

Mediation fees vary for each AAA office. Please check with your local AAA office for rates and mediator availability.

## COMMERCIAL ARBITRATION RULES

### R-1. Agreement of Parties*

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration



Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the demand for arbitration or submission agreement is received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules.

R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

R-3. National Panel of Arbitrators

The AAA shall establish and maintain a National Panel of Commercial Arbitrators and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, whether composed of one or more arbitrators and whether the arbitrators are neutral or party-appointed.

* A dispute arising out of an employment relationship will be administered under the AAA's National Rules for the Resolution of Employment Disputes, unless all parties agree otherwise after the commencement of AAA administration.

R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

i. The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

ii. The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

iii. The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

R-7. Applicable Procedures

Unless the parties or the AAA in its discretion determines otherwise, the Expedited Procedures shall be applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs. Parties may also agree to use the Expedited Procedures in cases involving claims in excess of $75,000. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures. All other cases shall be administered in accordance with Sections R-1 through R-56 of these rules.

R-8. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

R-9. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Rules in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

R-10. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an



administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters. There is no administrative fee for this service.

R-11. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

R-12. Qualifications of an Arbitrator

(a) Any neutral arbitrator appointed pursuant to Section R-13, R-14, R-15, or E-5, or selected by mutual choice of the parties or their appointees, shall be subject to disqualification for the reasons specified in Section R-19. If the parties specifically so agree in writing, the arbitrator shall not be subject to disqualification for those reasons.

(b) Unless the parties agree otherwise, an arbitrator selected unilaterally by one party is a party-appointed arbitrator and is not subject to disqualification pursuant to Section R-19.

R-13. Appointment from Panel

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) Immediately after the filing of the submission or the answering statement or the expiration of the time within which the answering statement is to be filed, the AAA shall send simultaneously to each party to the dispute an identical list of names of persons chosen from the panel. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the panel without the submission of additional lists.

(c) Unless the parties have agreed otherwise no later than 15 days after the commencement of an arbitration, if the notice of arbitration names two or more claimants or two or more respondents, the AAA shall appoint all the arbitrators.

R-14. Direct Appointment by a Party

(a) If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the

 

arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the panel from which the party may, if it so desires, make the appointment.

(b) If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

(c) If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

R-15. Appointment of Neutral Arbitrator by Party-Appointed Arbitrators or Parties

(a) If the parties have selected party-appointed arbitrators, or if such arbitrators have been appointed as provided in Section R-14, and the parties have authorized them to appoint a neutral arbitrator within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint a neutral arbitrator, who shall act as chairperson.

(b) If no period of time is specified for appointment of the neutral arbitrator and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the neutral arbitrator, who shall act as chairperson.

(c) If the parties have agreed that their party-appointed arbitrators shall appoint the neutral arbitrator from the panel, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-13, a list selected from the panel, and the appointment of the neutral arbitrator shall be made as provided in that section.

R-16. Nationality of Arbitrator

Where the parties are nationals or residents of different countries, the AAA, at the request of any party or on its own initiative, may appoint as a neutral arbitrator a national of a country other than that of any of the parties. The request must be made prior to the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

R-17. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. The parties may request three arbitrators in their demand or answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

R-18. Notice to Arbitrator of Appointment

Notice of the appointment of the neutral arbitrator, whether appointed mutually by the parties or by the AAA, shall be sent to the arbitrator by the AAA, together with a copy of these rules, and the signed acceptance of the arbitrator shall be filed with the AAA prior to the opening of the first hearing.

R-19. Disclosure and Challenge Procedure

(a) Any person appointed as a neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality or independence,

including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(b) Upon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

R-20. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate unilaterally concerning the arbitration with a neutral arbitrator or a candidate for neutral arbitrator. Unless the parties agree otherwise or the arbitrator so directs, any communication from the parties to a neutral arbitrator shall be sent to the AAA for transmittal to the arbitrator.

(b) The parties or the arbitrators may also agree that once the panel has been constituted, no party and no one acting on behalf of any party shall communicate unilaterally concerning the arbitration with any party-appointed arbitrator.

R-21. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

R-22. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion. There is no administrative fee for the first preliminary hearing.

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

R-23. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct (i) the production of documents and other information, and (ii) the identification of any witnesses to be called.

(b) At least five (5) business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

R-24. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

R-25. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

R-26. Representation

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

R-27. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

R-28. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

R-29. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

R-30. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative. A party or parties causing a postponement of a hearing will be charged a postponement fee, as set forth in the administrative fee schedule.

R-31. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

R-32. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

R-33. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

R-34. Evidence by Affidavit and Posthearing Filing of Documents or Other Evidence

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

R-35. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

R-36. Interim Measures

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

** The Optional Rules may be found at the end of this document.

R-37. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-34 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

R-38. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

R-39. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

R-40. Extensions of Time

ThThe parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

R-41. Serving of Notice

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (E-mail), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

R-42. Majority Decision

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

R-43. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

R-44. Form of Award

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

R-45. Scope of Award

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-51, R-52, and R-53. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include: (a) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and (b) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

R-46. Award upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award."

R-47. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

R-48. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

R-49. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

R-50. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Neither the AAA nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration conducted under these rules.

R-51. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees and service charges to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable.

The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award.

The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

R-52. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

R-53. Neutral Arbitrator's Compensation

(a) Unless the parties agree otherwise, members of the National Panel of Commercial Arbitrators appointed as neutrals on cases administered under the Expedited Procedures with claims not exceeding $10,000, will customarily serve without compensation for the first day of service. Thereafter, arbitrators shall receive compensation as set forth herein.

(b) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation, beginning with the first day of hearing in all cases with claims exceeding $10,000.

(c) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(d) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

R-54. Deposits

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

R-55. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

R-56. Suspension for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

# Expedited Procedures

E-1. Applicability

*Cat 2*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**00C 2645**

# Civil Cover Sheet

JUDGE LINDBERG
MAGISTRATE JUDGE LEVIN

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s): The American Bottling Company, a Delaware corporation** | **Defendant(s): Red Bull North America, Inc., a California corporation** |
| County of Residence: DuPage County, Illinois | County of Residence: |
| Plaintiff's Atty: Alan S. Rutkoff, David Marx, Charles P. Beveridge, Anthony F. Fata<br>McDermott, Will & Emery<br>227 W. Monroe St., Ste. 3100,<br>Chicago, IL 60606<br>312-372-2000 | Defendant's Atty:<br>John F. Verhey<br>Seidler & McErlean<br>161 N. Clark St., Ste. 2650<br>Chicago, IL 60601<br>312-516-0703 |

II. Basis of Jurisdiction:     **4. Diversity (complete item III)**

*DOCKETED*
*MAY 03 2000*

III. Citizenship of Principle
Parties **(Diversity Cases Only)**
                    Plaintiff:-**1 Citizen of This State**
                    Defendant:-**2 Citizen of Another State**

IV. Origin :                    **1. Original Proceeding**

V. Nature of Suit:              **190 Other Contract**

VI.Cause of Action:             **Dispute over breach of Distributorship Agreement between citizens of different states pursuant to 28 U.S.C. §1332(a)(2).**

VII. Requested in Complaint
            Class Action:**No**
            Dollar Demand:**In excess of $75,000**
            Jury Demand:**No**

VIII. This case <u>**Is NOT**</u> a refiling of a previously dismissed case. (If yes case number __ by Judge __)

Signature: *Charles P. Beveridge*

Date: 5/2/2000

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

The American Bottling Company,
                    Plaintiff,

v.

Red Bull North America, Inc.
                    Defendant.

**00C 2645**

Case Number:

**JUDGE LINDBERG**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

The American Bottling Company

MAGISTRATE JUDGE LEVIN

DOCKETED

FILED-EO5
00 MAY -2 PM 2: 28
CLERK
U.S. DISTRICT COURT

MAY 0 3 2000

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME Alan S. Rutkoff | | | NAME Charles P. Beveridge | | |
| FIRM McDermott, Will & Emery | | | FIRM McDermott, Will & Emery | | |
| STREET ADDRESS 227 W. Monroe, Suite 3100 | | | STREET ADDRESS 227 West Monroe Street, Suite 3100 | | |
| CITY/STATE/ZIP Chicago, IL 60606 | | | CITY/STATE/ZIP Chicago, Illinois 60606 | | |
| TELEPHONE NUMBER 312-372-2000 | | | TELEPHONE NUMBER 312-372-2000 | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 2427117 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6236710 | | |
| MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ |
| TRIAL ATTORNEY? | YES ☒ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☒ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☒ |

| (C) | | | (D) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME Anthony F. Fata | | | NAME David Marx | | |
| FIRM McDermott, Will & Emery | | | FIRM McDermott, Will & Emery | | |
| STREET ADDRESS 227 West Monroe Street, Suite 3100 | | | STREET ADDRESS 227 West Monroe Street, Suite 3100 | | |
| CITY/STATE/ZIP Chicago, Illinois 60606 | | | CITY/STATE/ZIP Chicago, Illinois 60606 | | |
| TELEPHONE NUMBER 312-372-2000 | | | TELEPHONE NUMBER 312-372-2000 | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6269721 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6194003 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ | MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☒ | TRIAL ATTORNEY? | YES ☒ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☒ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

1-3